## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DONALD MOORE, SR.           )

                               )

              Plaintiff,        )       No. 09 C 0036

                               )

v.                             )       Magistrate Judge Cole

                               )

MICHAEL J. ASTRUE, Commissioner    )

of Social Security,                  )

                               )

             Defendant.      )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Donald Moore, Sr., seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.S. § 1382c(a)(3)(A).  Mr. Moore asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

On June 10, 2005 Donald Moore, Sr. applied for DIB and SSI alleging disability beginning March 1, 2001, due to various leg and respiratory impairments.  (Administrative Record ("R.") 2, 15-17, 80).  His application was denied initially and on reconsideration.  (R. 7, 75).  Mr. Moore filed a timely request for hearing on February 1, 2006.  (R. 68).  An administrative law judge ("ALJ") convened a hearing on July 2, 2008, at which Mr. Moore, represented by counsel, appeared and testified.  (R. 181-225).  Also at the hearing were Dr. Ernest Mond, who testified as a medical expert

("ME"), and Frank Mendrick, who testified as a vocational expert. (R. 182). At the hearing, Mr. Moore agreed to amend the onset date of his claim to June 1, 2002. (R. 184). On September 10, 2008, the ALJ issued a partially favorable decision finding that Mr. Moore was capable of the full range of sedentary work but that he was eligible for SSI as of May 1, 2008, due to a change in his age category that required a finding of disabled by direct application of Medical-Vocational Rule 201.12. (R. 20). *See,* 20 C.F.R. Part 404, Subpart P, Appendix 2. Mr. Moore's claim for benefits for the period between June 1, 2002 and May 1, 2008, was denied because prior to that date he was not disabled by direct application of Medical-Vocational Rule 201.18 since he was capable of the full range of sedentary work. (R. 20). Mr. Moore's DIB claim was denied because his last insured date was December 31, 1995, which is before the amended onset date. (R. 14). This became the final decision of the Commissioner when the Appeals Council denied Mr. Moore's request for review on November 21, 2008. (R. 3). Mr. Moore has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Moore was born May 2, 1958. (R. 80). He was forty-four years old at the alleged onset date of disability and fifty years old at the time of the ALJ's decision. (R.19). He is 5'5" and weighs 132 pounds. (R. 169). Mr. Moore is a high-school graduate and has a certificate in plumbing from a technical school. (R. 90-91). He can read, write, and do basic arithmetic. (R 191). Over the past

2

thirty years, Mr. Moore has worked as a maintenance man, carpenter, forklift operator, crane operator, shipping and receiving clerk, and most recently as a plumber. (R. at 90-95, 193-195). He has been unemployed since June 1, 2002. (R. 183-84).

## B.

## Medical Evidence

Mr. Moore has never had a consistent treating physician. His contact with the health care system has been primarily through sporadic visits to the emergency rooms of various Chicagoland hospitals. (R. 129-55). In addition to the records from these visits, the Administrative Record contains the results of two consultative examinations; the first performed for a state agency on August 9, 2005, (R. 116-20), and the second performed after the hearing on August 5, 2008, by order of the ALJ. (R. 157-78).

### 1.

### Respiratory Conditions

Mr. Moore's 2005 state agency consultative exam noted that he had a history of asthma and that he was a smoker. (R. 116). His respiratory symptoms were not considered in the subsequent RFC assessment done by a non-examining physician for the state agency. (R. 121).

On April 9, 2006, plaintiff was treated in the Emergency Department of Roseland Community Hospital for an asthma attack after he ran out of medication (R. 133). A chest x-ray was performed that showed emphysema in both lungs. (R. 134). The notes from that visit also indicated that Mr. Moore was a smoker. (R. 133). Mr. Moore was discharged after being prescribed Prednisone, Bactrim and Albuterol. (R. 145).

3

Mr. Moore again visited Roseland Community on June 18, 2008 and was treated in the Emergency Department for asthma exacerbation and prescribed Albuterol and Prednisone. (R. 155). He visited Provident Hospital earlier that same day but the records from that visit are illegible. (R. 153-54).

A spirometry report from August 6, 2008 showed severe restriction prior to medication and moderate obstruction and a low vital capacity after medication. (R. 162).

## 2.

### Leg Conditions

Mr. Moore was treated in the Emergency Department at Oak Forest Hospital on March 27, 2004 for bilateral foot pain. (R. 146). He was given a prescription for some medication – the writing is illegible -- and referred to the podiatry clinic. (R. 150-51).

On August 17, 2005, Mr. Moore was examined by an internist consulting for a state agency. (R. 116). He stated that he was born with a club foot and that he used a splint when he was a child. (R. 116). He complained of difficulty walking (especially on the right ankle and right foot), inability to move his toes on either foot, occasional numbness and pain in both legs, inability to climb stairs, and difficulty standing up from a seated position. (R. 116). Mr. Moore reported that he wore a special shoe and was able to walk a block with the use of a non-prescribed cane. (R. 116). The internist observed that he limped, favoring his right side but he was able to get on and off the examining table without difficulty. (R. 117). The measurement of his right leg was two inches

shorter than that of his left leg. (R. 118). There was no swelling of either ankle but Mr. Moore exhibited tenderness on his right ankle and the dorsum of his right foot. (R. 118). He was unable to perform a full range of motion on both ankles. (R. 118). An x-ray of his right ankle taken on October 14, 2005, was normal. (R. 120).

On October 20, 2005, a state agency physician completed an RFC assessment based on the results of the consulting internist's examination and the x-ray. (R. 121). It does not appear that the agency physician considered any respiratory symptoms in formulating her assessment. (R. 121-28). In her opinion Mr. Moore could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. (R. 122). She found that Mr. Moore could sit for about 6 hours in an 8-hour workday and stand or walk with normal breaks for at least 2 hours in an 8-hour workday. (R. 122). Her assessment indicated that he would be limited in operating foot controls, and that he could occasionally climb ramps, stairs, ladders, ropes, or scaffolds and occasionally engage in other activities requiring balancing. (R. 123). It also indicated that he could frequently stoop, kneel, crouch and crawl. (R. 123). No other limitations were indicated. (R. 124-25).

Mr. Moore visited Provident Hospital on June 18, 2008, but the records from that visit are illegible, although it does appear that he was given a follow-up appointment in the orthopedics clinic. (R. 152-54).

On August 5, 2008, Mr. Moore saw a consulting orthopedist, Dr.Elmes, as ordered by the ALJ. (R. 167). Dr. Elmes' clinical impression listed thirteen separate problems:

Problem #1: Bilateral non-specific groin pain radiating to the legs, left most severe.

Problem #2: Bilateral ankle pain, left more severe.

Problem #3: Non-specific left and right knee pain.

Problem #4: Status post bilateral club foot deformity as a child, treated with corrective casting.

Problem #5: 1" right calf atrophy.

Problem #6: Arthrofibrosis, bilateral ankles, right more severe.

Problem #7: Leg length inequality, right ¾' shorter than the left.

Problem #8: Non-specific low back pain.

Problem #9: Non-specific right and left ankle pain.

Problem #10: Non-specific left foot pain.

Problem #11: Asthma.

Problem #12: Emphysema.

Problem #13: Decreased vision.

(R. 170-71). In his work-related abilities assessment, Dr. Elmes found that Mr. Moore could frequently lift up to twenty pounds and could occasionally lift up to fifty pounds. (R. 172). He found the Mr. Moore could frequently carry up to ten pounds and occasionally carry up to twenty. (R. 172). The assessment indicated that Mr. Moore could sit for 45 minutes without interruption for up to 5 hours in an eight our workday. (R. 173). It indicated that he could stand or walk for twenty minutes at a time but for only one half hour in an eight hour workday. (R. 173). Dr. Elmes thought Mr. Moore would need a can to walk four days a week and that without a cane he could walk only

fifty feet. (R. 173). He thought that Mr. Moore could frequently (but not continuously) reach, handle, finger and feel, and that he could occasionally push and pull with his hands. (R. 174). He found that Mr. Moore could occasionally operate foot controls. (R. 174). The assessment also indicated that Mr. Moore could occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl, but that he could never climb ladders or scaffolds. (R. 175). Dr. Elmes found that Mr. Moore's vision impairment would pose no workplace limitations beyond an inability to read very small print. (R. 175). Dr. Elmes found that Mr. Moore had the following environmental limitations: he would need to be in a moderate or quiet work environment, could occasionally tolerate operating a motor vehicle or extreme heat, and could never tolerate unprotected heights, moving mechanical parts, humidity, dust, odors, pulmonary irritants, extreme cold, or vibrations. (R. 176). Dr. Elmes also found that Mr. Moore could perform daily living activities without assistance, with the exception of walking a block at a reasonable pace on rough or uneven surfaces. (R. 177).

Dr. Elmes' clinical impressions and work-related abilities assessment were based on Mr. Moore's description of his symptoms and data gathered from a physical examination. (R. 167). Mr. Moore reported to Dr. Elmes that he had congenital club feet as a child and was treated with casts and braces until he was eight. (R. 167). He stated that in favoring the feet he gradually developed bilateral groin and leg pain, more severe on the left side, which he had had for many years and which usually occurred 3-4 days per week. (R. 167). The intensity of the groin pain on the day of examination was an eight out of a 10 point scale. (R. 168). Mr. Moore stated that on his best days he had no pain and that on his worst days his pain was 9.5. (R. 168). His ankle pain on the day of examination was a 7, with a report of 0 on his best days and 8.5 on his worst days. (R. 168). He reported that weather change, pivoting, twisting and direct pressure aggravate the pain in his ankles

and groin. (R. 168). Alleviating factors were moist heat, massage, rest, use of a cane, and medication with ibuprofen, Advil, or Vicodin when it is more severe. (R. 167-68). Mr. Moore also told Dr. Elmes about his asthma, emphysema, and episodic lower back pain. (R. 168).

Mr. Moore said that shopping and household chores increased groin and leg pain. (R. 168). He told Dr. Elmes that walking aggravated the pain, that it took him more than twenty minutes to walk two blocks and that strength in his left leg decreased with distance walked and it occasionally failed altogether. (R. 168). Mr. Moore also said driving and heavy lifting aggravated his pain, and that he could do some yard work for up to thirty minutes before requiring a rest. (R. 168). In addition, he reported that prolonged sitting caused episodic numbness of his right leg. (R. 168).

On physical examination Dr. Elmes found that Mr. Moore had a normal gait with a slight limp favoring the left leg. (R. 169). Walking caused left groin pain. (R. 169). Toe standing and walking a few steps caused right ankle pain. (R. 169). Hopping produced right ankle pain. (R. 169). Half squat position caused left knee pain. (R. 169). Mr. Moore could get on and off the exam table unassisted. (R. 169). He had tenderness and decreased range of motion in both ankles and knees. (R. 169-70). Dr. Elmes also enclosed a radiologists x-ray report which indicated an unremarkable examination and identified no bony or joint abnormalities and no soft tissue problems in the left lower leg and right ankle. (R. 166).

### Administrative Hearing Testimony

**1.**

### Plaintiff's testimony

At the administrative hearing on July 2, 2008, Mr. Moore testified that he had to stop working in the spring of 2002 because he was no longer quick enough on his feet to keep up with the physical demands of work as a plumbing sub-contractor, laborer, and loading operator. (R. 192-94). He also testified that he was prevented from working by frequent asthma flare ups, particularly in the winter. (R. 191).

Mr. Moore stated that he had had trouble sleeping due to his asthma the night before and during the week prior to the hearing. (R. 195). He said that he had trouble breathing year round, and that it was getting worse with age. (R. 198). He claimed that he first experienced problems with asthma around entering high school. (R. 204). Mr. Moore admitted that he still smoked at the time of the hearing although he claimed to have cut back to less than four cigarettes a day. (R. 213).

Mr. Moore testified that he was born clubfooted and that he wore braces on his legs as a child. (R. 201). He said that one leg has always been shorter than the other and that although he had been able to walk and even run as a child he has had increasing pain with age. (R. 201-2). He complained of episodic pain in his right ankle that made it feel like it "was in like a vise, somebody just taking something and then just squeezing it." (R. 204). This pain usually subsided after 30-40 minutes. (R. 204). Mr. Moore also complained of recent pain in his hip. (R. 205). He testified that in the past year he had been experiencing radiation of the ankle pain up both legs. (R. 205-6).

Mr. Moore testified that on some days he "just can't walk." (R. 199). On his good days he complies with recommended treatment of walking for exercise. (R. 199). He is sometimes able to reach a park "a couple of blocks" from his house and return. (R. 199). Mr. Moore uses a cane to take weight off of his right leg and to aid him in balancing. (R. 202-3). He arrived at his hearing by public transportation having forgotten both his cane and his asthma medication at home. (R. 202). He had been given a ride to the "L" train from his home. (R. 202). He added that he can only ride the train or bus if he is able to sit down. (R. 203). He was able to walk the four blocks from the train station to the hearing without the cane or his medication, although he had to stop along the way and he complained of being out of breath even after the hearing had started. (R. 198). He stated that that was the farthest distance he had been able to walk in "a good while." (R. 198). Mr. Moore testified that he was unable to maintain his balance on the bus or L train and therefore needed to be seated to use public transportation. (R. 203). He is most comfortable in a seated position with his legs extended. (R. 207).

Mr. Moore lives with his sister and her son in a first floor apartment. (R. 188). Mr. Moore testified that he was able to cook, do laundry at home, and maintain his personal hygiene without assistance. (R. 198-99). He is able to do the shopping with the help of his sister. (R. 199). He stated that, if he is able to borrow a car, he sometimes drives to visit his grandchildren or to go to church. (R. 190). Mr. Moore stated that he "tr[ies] to go [to church] every Sunday" and attends a Bible study class once a week. (R. 200).

Since he is uninsured, Mr. Moore has sought to treat his leg pain primarily by soaking the affected area in hot water and Epsom salts. (R. 204-5). He said that Vicodin (which he tried when

it was prescribed to his sister for post-surgical pain) is the only medication that has ever given him lasting relief from his ankle pain. (R. 207). An 800-milligram dose of Ibuprofen provided temporary partial relief, but Mr. Moore testified that he had been told that this would not be a viable long term treatment option due to potential side effects. (R. 207). He stated that he was currently on Prednisone and that he used Albuterol daily, with heavier use on the days when subsidence in pain allowed him to be more active. (R. 208-9). Mr. Moore testified that since he is uninsured he is forced to wait for his symptoms to become acute and then seek treatment in the emergency room. (R. 195, 209). Mr. Moore stated that he did not follow-up on a referral to a podiatrist he received during a 2004 emergency room visit at a private hospital because he was uninsured and couldn't afford to pay for the specialist visit. (R. 212).

## 2.

### Medical Expert's Testimony

The medical expert ("ME"), Dr. Ernest Mond, was present during Mr. Moore's testimony and had the opportunity to ask him a few questions. (R. 211-14). He also had access to all of the medical evidence except Dr. Elmes' consultative examination and the accompanying tests which were performed after the hearing. (R. 213-14). When asked to list the claimant's physical impairments resulting from anatomical and physiological abnormalities demonstrated by medically acceptable clinical and laboratory diagnostic techniques he complained that the record was "lacking in important information." (R. 211-13). He then briefly reviewed the medical evidence of clubfoot, bilateral foot pain, asthma, emphysema, leg pain on both sides, inability to moves his toes or ankles, limited ability to walk with the use of a cane, leg length disparity. (R. 213-14). The ALJ then asked him, "[I]s there sufficient objective evidence of record to allow you to form an opinion?" The ME

11

responded, "Well, I'd have to interpolate and have to, have to use a fair amount of guess work here." (R. 215). The ALJ then asked if this guesswork would be based on the record to which the ME replied, "...I don't have a medical record. There's no continuing ongoing medical record in this file." (R. 215). The ALJ then asked if Mr. Moore met or equaled a listing, to which the ME replied simply, "No." (R. 215).

The ME then gave his opinion of Mr. Moore's workplace vocational abilities, first hedging his answer by saying, "This is on the basis of the information that I have in this file and essentially also to some degree what Mr. Moore tells us." He then testified that Mr. Moore could occasionally lift and carry twenty pounds and frequently lift and carry ten. (R. 215). The ME stated that Mr. Moore could stand or walk at least two hours in an eight hour workday and could sit for an unlimited time (R. 215); that he could push or pull objects or levers (R. 215-16); that he should never be on ropes, ladders or scaffolds (R. 216); that he could climb stairs and be required to balance occasionally. (R. 216). The ME thought Mr. Moore should avoid extreme cold and exposure to hazardous machinery, unprotected heights, fumes and pulmonary irritants. (R. 216). He said that Mr. Moore could occasionally bend, squat, and crawl and would have no trouble reaching above shoulder level. (R. 216). He stated that this assessment was based on the records of emergency room visits going back to 2004, and the consultative exam performed in 2005. (R. 216)

## 2.

### Vocational Expert's Testimony

The vocational expert ("VE"), Mr. Frank Mendrick, was present for Mr. Moore's testimony as well as that of the ME. He also reviewed Mr. Moore's application for benefits. (R. 218). The VE testified that Mr. Moore was in the "younger individual" age category, had a high school

diploma, and had past work experience as a semi-skilled worker in the heavy to medium category. (R. 218-19). The VE testified that Mr. Moore had no skills transferable to the sedentary category. (R. 219). Given his medical limitations as described by the ME, the VE testified that Mr. Moore could perform the work required for general assembly (3000), simple inspection (1500 positions), or hand laborer (3500 positions). (R. 219). The VE did not state whether these jobs existed in the Chicago region or whether his numerical estimates applied to the region or the national economy. (R. 219). The ALJ decided to forego asking any more detailed questions or adding limitations to the vocational profile due to lack of current medical information. (R. 219). The ALJ remarked that a consultative examination would be needed since he didn't think enough information was available to give the VE the "full story." (R. 219)

### III.

### The ALJ's Decision

The ALJ concluded that that Mr. Moore had not met the requirements for insured status under the Social Security Act since December 31, 1995 and was therefore ineligible for disability insurance benefits. (R. 15, 20). The ALJ determined that when Mr. Moore attained the age of 50 on May 1, 2008 he became disabled by direct application of Medical-Vocational Rule 201.12. (R. 20). The ALJ held that Mr. Moore was not disabled under the Social Security Act (and therefore not eligible for supplemental security income) prior to May 1, 2008 because up to that date there were a significant number of jobs in the national economy that he could have performed given his age, education, work experience, and residual functional capacity. (R. 19). The ALJ analyzed the case using the Social Security Administration's five step sequential evaluation process under 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). (R. 14).

The ALJ found that Mr. Moore met the first step since he had not engaged in substantial gainful activity since the alleged onset date of June 1, 2002. (R. 15). At the second step the ALJ determined that Mr. Moore had the following severe impairments: right club foot, bilateral foot pain, asthma (beginning in 2004), and right leg disorder. (R. 16-17).

At step three the ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. In dealing with this element, the ALJ stated simply, "I adopt the opinion of Dr. Mond, which was supported by the evidence, and find no listed impairment to be met or equaled by any of the claimant's impairments, either singly or in combination." (R. 17).

At the fourth step the ALJ found that Mr. Moore could not perform his past relevant work. (R. 19). In reaching this conclusion the ALJ made the ancillary finding that Mr. Moore had the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.920(d). (R. 17). The ALJ arrived at this RFC by applying a two-step framework as laid out in Social Security Rulings 96-4p and 96-7p. (R. 17). First, he determined that Mr. Moore had an underlying medically determinable physical impairment that was demonstrated by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the alleged symptoms. (R. 18). He did not make a finding as to the onset of this impairment. (R. 18).

The ALJ then moved to the second prong of the test which requires him to make a finding on the credibility of the claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms when such statements are not substantiated by objective medical evidence.

14

(R. 18). The ALJ found that Mr. Moore's statements concerning the intensity, persistence and limiting effect of his symptoms were not credible prior to May 1, 2008. (R. 18). He noted that the medical record is sparse and indicated little follow-up for his right club foot and no evidence of treatment following repeated complaints of bilateral foot pain. (R. 18). The ALJ observed that although the claimant testified at hearing that he could walk four blocks with rest, he alleged that he could only walk two blocks at his subsequent examination with Dr. Elmes. (R. 18). The ALJ expressed skepticism at this "50% decrease in less than six weeks." (R. 18). The ALJ also noted that although Mr. Moore claims to need a cane, none had been prescribed. (R. 18). He concluded that Mr. Moore's complaints were not credible "due to the lack of the treatment that could be expected if the claimant had experienced the pain complained of, particularly when his normal activities of daily life including [sic] shopping, doing the laundry, and going to church." (R. 18).

The ALJ pointed out that although Mr. Moore claims not to be able to move the toes on either foot, neither the 2005 X-rays nor the 2008 X-rays showed any abnormality. (R. 18). He disregarded Mr. Moore's asthma because of his continued smoking, relying on 20 C.F.R. 416.950 and SSR 82-59 which state that a claimant may be denied benefits where he could ameliorate his condition but has chosen not to do so. (R. 18). The ALJ further noted that he did not agree with the sitting standing and walking determinations made by Dr. Elmes at Mr. Moore's most recent physical examination because they were not supported except by the self-reporting of the patient. (R. 18). He states, "Nowhere can I find limitations on sitting by any objective measurement. Pain in the legs of the nature described by the claimant should be alleviated by sitting." (R. 18). He also observed that no etiology was given for Mr. Moore's groin pain. He concluded that Mr. Moore's complaints are not fully credible as they are not supported by objective medical evidence. (R. 18).

Based on these conclusions regarding Mr. Moore's credibility, the ALJ found that the evidence did not support a limitation to less than a sedentary capacity at present or at any time since the onset date. (R. 19). He explicitly adopted the opinion of Dr. Mond, the ME, stating that it was consistent with that of the State Agency physician at the first consultative exam and that it was consistent with the evidence of record. (R. 19).

At step five the ALJ found Mr. Moore "not disabled" by direct application of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. 19). If a claimant can perform all or substantially all of the exertional demands at a given level of exertion the Medical-Vocational rules direct a conclusion of either "disabled" or "not disabled" depending on the claimant's specific vocational profile. SSR 83-11. The ALJ found that Mr. Moore was capable of the full range of sedentary work and considering his age, education, and work experience applied Medical-Vocational Rule 201.18 to reach a finding of "not disabled." (R. 20).

## IV.

### Discussion

#### A.

#### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: a court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Substantial evidence is more than a scintilla and something less than a preponderance. *See Schmidt v. Astrue*, 496 F.3d 841-42 (7th Cir. 2007).

The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While judicial review is "very deferential," *Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008); *Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995), it is not abject. *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010). But we are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. In fact, even if "'reasonable minds could differ concerning whether [plaintiff] is disabled,'" we must nonetheless affirm the ALJ's decision denying his claims if the decision is adequately supported. *Elder,* 529 F.3d at 413-14. We may not however rubber stamp the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have articulated the reasons for his decision at some minimal level. *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir.2004); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595.

**B.**

**Five Step Sequential Analysis**

Social Security Regulations require a five-step sequential inquiry by the ALJ to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. 404.1520; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351-52 (7th Cir.2005). *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir.2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. 416.920; *Briscoe,* 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir.1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. 404.1520; *Stein,* 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe,* 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir.1997).

**C.**

**Analysis**

The ALJ's denial of Mr. Moore's application for a period of disability and disability insurance benefits is affirmed because it is undisputed that Mr. Moore was last insured on December

31, 1995 and the stipulated onset date of his disability is June 1, 2002. *See* 20 C.F.R. 404.315, .320. This determination is not challenged by the plaintiff's brief. Similarly, the ALJ's finding of disability, beginning May 1, 2008, is affirmed as there is substantial evidence to show that Mr. Moore has only a high school education, cannot perform his past work experience, and that his residual functional capacity is at least restricted to sedentary work if not more severely. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Medical-Vocational Rule 201.18. Again, this finding is not challenged by the plaintiff. Accordingly, the remainder of this review will focus on whether the ALJ's decision to deny supplemental security income for the period from June 1, 2002 (the alleged onset date) through April 30, 2008 was supported by substantial evidence and adequately explained by the ALJ.

## 1.

## The ALJ Failed To Adequately Explain His Step Two Determination

The plaintiff contends that the ALJ did not specify Mr. Moore's particular impairments. (Pl. Mem. at 9). While this is not true, the ALJ failed to build an accurate and logical bridge between the evidence and his conclusion. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). A severe impairment is one that limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. 404.1520(c). This determination is important because those impairments and combinations of impairments identified as severe are those that will be considered throughout the remaining steps of the disability determination process. 20 C.F.R. 404.1523.

Contrary to plaintiff's contention that no impairments were specified, the ALJ identified Mr. Moore's severe impairments as right club foot, bilateral foot pain, asthma since 2004, and right leg

disorder. (R. 15). In this case, unlike that cited by plaintiff, (*Unger v. Barnhart*, 507 F. Supp.2d 929 (N.D. Ill. 2007)), the ALJ gave a thorough recitation of all the evidence both of those impairments he found to be severe, and those he did not. What is lacking, however, is a discussion of that evidence that would allow this court to "trace the path" of his reasoning. *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993). The ALJ's opinion merely summarizes the medical evidence and the relevant testimony of Mr. Moore and Dr. Mond. Although his summary of the record includes mentions of leg length discrepancy, bilateral groin and ankle pain, emphysema, and low back pain among other conditions, he gives no indication why he finds that they are not severe enough (either alone or in combination) to limit his ability to do basic work activities. Similarly, he does not articulate the basis for his finding of severity in those conditions he did designate. He also does not explain why he listed 2004 as the onset of Mr. Moore's asthma but gave no onset date for any of the other impairments. The reasons for an ALJ's finding cannot be implied from a mere recitation of the evidence, "he must *specify* the reasons for his finding." *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir.2003) (emphasis in original). Accordingly, this court cannot affirm the ALJ's step two determination as there is no opportunity for meaningful review, and this case must be remanded for a more thorough analysis of the evidence at step two.

## 2.

### The ALJ Failed to Adequately Explain his Step Three Determination

The burden is on the ALJ to identify relevant listed impairments in the federal regulations that compare with the claimant's impairment. The ALJ is also required, as at all stages of the analysis to build a "logical bridge" from the evidence to the conclusion and cannot simply ignore lines of evidence that do not support his conclusion. *Clifford,* 227 F.3d at 872; *Zurawski v. Halter,*

245 F.3d 881, 888 (7th Cir. 2001). When considering opinion evidence he must consider the following factors: examining relationship, treatment relationship, length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, and specialization. 20 C.F.R. 404.1527.

In *Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006), the Seventh Circuit examined the following step three discussion and found it deficient, "The claimant does not have an impairment which meets or equals the severity criteria of any impairment in the Listings. The Social Security Administration's non-examining experts [SSR 96-6p], reviewed the evidence of record and opined that the claimant's condition did not medically equal any Listing (see Exhibits 1A-2A, 10F)." *Id.* at 583. The court explained that "an ALJ should mention the specific listings he is considering and that failure to do so, if combined with a perfunctory analysis requires a remand." *Id.* It found the analysis to be perfunctory since it rested solely on the conclusions of non-examining experts while ignoring other evidence in the record, including the reports of examining physicians, which might have met claimant's burden to show that he met all criteria of a particular listing. *Id.* at 583-84. The Seventh Circuit later refined this holding in *Knox v. Astrue*, 2009 WL 1747901, *2 (7th Cir. 2009), declaring that the ALJ was not under an obligation to discuss specific listings unless the claimant had "present[ed] medical evidence supporting the position that his impairments met or equaled a particular listing." (Findings of equivalence are made under the following standard: "If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing." 20 C.F.R. 404.1526(2).

Mr. Moore met his preliminary obligation under *Knox* to present evidence potentially supporting the position that Mr. Moore equals Listing 1.02 or 1.03 (Pl. Mem. at 11). The only reason that Mr. Moore does not meet Listing 1.02 is that he has not presented medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). However, one might deem the evidence of leg length discrepancy and club foot in the emergency room reports and the reports of the examining physicians to be of equal medical significance to such imaging. The ALJ should have at least explained his reasoning for rejecting this equivalence. Mr. Moore has not had reconstructive surgery as required by Listing 1.03 but the reconstructive bracing procedures he underwent as a child and his subsequent inability to ambulate effectively might conceivably be analogous enough to establish equivalence. Mr. Moore also presented evidence that could conceivably support an equivalence with Listing 3.03 concerning asthma.

The ALJ's entire discussion of his step three determination consists of one sentence, "I adopt the opinion of Dr. Mond, which was supported by the evidence, and find no listed impairment to be met or equaled by any of the claimant's impairments, either singly or in combination." This is almost identical to the deficient discussion in *Ribaudo*. Although it was not his burden, Mr. Moore's counsel pointed out at the hearing that his impairments might meet Listing 1.03. (R 186). The ALJ failed to discuss why Mr. Moore's impairments did not meet this listing or to proffer any of his own for comparison.

Furthermore, the ALJ's analysis was perfunctory in that it relied on the opinion of Dr. Mond without explaining the evaluation of its weight under the factors laid out in 20 C.F.R. 404.1527, particularly when reports from examining physicians were available. The ALJ effectively abdicated

his "final responsibility for deciding" whether Mr. Moore's impairments met or equaled a listing. 20 C.F.R. 404.1527(e)(2). For this reason, the case must be remanded for a more thorough analysis of the evidence at step three.

### 3.

### The ALJ's RFC Determination was Erroneous

The federal regulations require that the ALJ follow a two-step process in formulating the RFC. 20 C.F.R. 404.1529. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (i.e. an impairment that can be shown by medically acceptable laboratory and clinical diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. *Id.* Once such an impairment has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. *Id.* For this purpose, whenever the claimant's statements about the intensity, persistence, or limiting effects of the symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements. Id. In this case, the ALJ found there were medically determinable physical impairments that could reasonably be expected to cause Mr. Moore's pain and other symptoms. (R. 18). The ALJ did not indicate which impairments met this threshold, and did not make any findings as to the onset date of the physical impairments that could reasonably be expected to produce the alleged symptoms.

The ALJ's determination that Mr. Moore was not fully credible was "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The credibility issue is particularly important in this case since Mr. Moore's club foot and leg length disparity are medically demonstrable from

birth. Thus Mr. Moore's statements as to when the resulting pain became so bad as to restrict his ability to do basic work activities are crucial. *See Briscoe v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005) (holding that an ALJ must explore other sources of evidence including the claimant's allegations and the date the claimant stopped working when the medical evidence is insufficient to establish an onset date ). Additionally, once he had rejected Mr. Moore's statements about his pain as a source of evidence, the ALJ failed to specifically indicate what evidence he did use to formulate the RFC. Therefore this case must be remanded for a re-evaluation of Mr. Moore's credibility, a re-examination of all the evidence pertaining to Mr. Moore's RFC, and if necessary the determination of the onset of the underlying impairments.

## A.

### The ALJ Failed to Make a Properly Supported Credibility Determination

A reviewing court generally affords an ALJ's credibility determination special deference since the ALJ is in the best position to see and hear the witness and assess the witness' forthrightness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). A court should reverse an ALJ's credibility determination only if the claimant can show it was "patently wrong. *Id.* However, when the ALJ bases his determination on "objective factors or fundamental implausibilities rather than subjective consideration such as a claimant's demeanor" the reviewing court has greater freedom to review the decision. *Clifford*, 227 F.3d at 872.

If a claimant's complaints of pain are not fully supported by the objective medical evidence the court has provided the following guidance for the ALJ's inquiry:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged

24

inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Clifford* at 871-72. While the ALJ need not discuss all of these factors, the reasoning behind the factors he does consider must be sound. *Grieves,* 2008 WL 2755069 at *19; *see Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir. 2004).

The first reason the ALJ gave for finding Mr. Moore's complaints not credible is that they are not supported by objective medical evidence. (R. 18). However, as noted above, the ALJ has at this point in his analysis already found that Mr. Moore's medically determinable impairments could reasonably be expected to produce the alleged pain. (R. 18). The ALJ appears to contradict himself by arguing that Mr. Moore's allegations are logically incongruous with the medical evidence. In support of this argument he cites the fact that although Mr. Moore claims to be unable to move his toes, the x-rays taken of his feet on two occasions show no abnormality. (R. 18). He does not say why x-ray would be a definitive test of the ability to move one's toes. He also points out that there is no etiology given for Mr. Moore's groin pain. (R. 18). Again this conflicts with his earlier conclusion that Mr. Moore's medically determinable impairments could reasonably be expected to produce his alleged pain, and at most indicates that Mr. Moore's allegations of groin pain fail to meet the first prong of the test and that his groin symptoms should be excluded from the RFC formulation.

None of the facts discussed contradict Mr. Moore's claims; they merely fail to support them.

25

But the absence of corroboration, in and of itself, does not mean that Mr. Moore's testimony must be rejected. Phrased differently, "the fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (7th Cir. 2001). As the court in *Clifford* instructed, allegations of pain that are not supported by the medical evidence must be evaluated by factors including the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities. *Clifford*, 227 F.3d at 871-72.

The ALJ addressed some of these factors. In terms of daily activities, he noted that although the Mr. Moore testified at hearing that he could walk four blocks, he alleged that he could only walk two blocks at his subsequent examination with Dr. Elmes. (R. 18). The ALJ expressed skepticism at this "50% decrease in less than six weeks." (R. 18). This apparent discrepancy is easily accounted for by the difference in the length of blocks. Mr. Moore testified that he had walked to the hearing from the public transportation station. (R. 198). The ALJ estimated this distance as four blocks. (R. 198). Mr. Moore responded, "I don't consider these whole blocks. It takes two blocks to make one down here I guess." (R. 198). Later in the hearing this issue was discussed again when Mr. Moore claimed that he could walk only "a couple" blocks to a park near his home, where he could rest before the return trip." (R. 199). The ALJ again asked how he was able then to make it from the transit station to the hearing and Mr. Moore again responded, "Well, these blocks here are not like the blocks where I live at because it's like two of these here blocks equal maybe one of our blocks." (R. 200). Given this, it is not surprising that Mr. Moore told Dr. Elmes that he could walk

only two blocks, while in his discussion with the ALJ he admitted walking the four blocks from the transit station to the hearing.

The ALJ also noted that Mr. Moore's alleged pain conflicted with his "normal activities of daily life including shopping, doing the laundry, and going to church." (R. 18). In *Clifford*, the Seventh Circuit held that "minimal daily activities…do not establish the claimant does not suffer disabling pain." *Clifford*, 227 F.3d at 872. In that case, the claimant testified that she could perform two hours of household chores with breaks, that she could cook simple meals, that she could vacuum with increased back pain, go grocery shopping about three times a month and sometimes carry groceries from her car, and occasionally lift a twenty pound sack of potatoes. *Id.* She stated that her husband helped with the household chores whenever possible. *Id.* She testified that she walked 3-5 blocks at a stretch to get for exercise as recommended by her doctor. *Id.* She also said that she played two rounds of cards about twice a month. The court held that the activities listed did not undermine or contradict her claim of disabling pain. *Id.* The Seventh Circuit has held that "this sort of casual equating of household work to work in the labor market cannot stand." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). In order to be relevant to a credibility inquiry, an activity engaged in by the claimant would have to be unlikely given their alleged symptoms, providing "affirmative evidence of malingering." *Vertigan*, 260 F.3d 1044 at 1049. Barring that, an ALJ must provide reasons as to why a claimant's limited daily activities translate into the claimant's ability to work an eight hour day, five days a week. *See Carradine v. Barnhart*, 360F.3d 751, 755 (7th Cir. 2004).

Mr. Moore's list of daily activities are similar to Clifford's. He stated that he could walk two to four blocks without rest. (R.198). He testified that he was able to cook, do laundry at home, and maintain his personal hygiene without assistance. (R. 198-99). He is able to do the shopping with the help of his sister. (R. 199). He stated that if he is able to borrow a car he sometimes drives to visit his grandchildren or to go to church, (R. 190) and that he "tr[ies] to go [to church] every Sunday" and attends a Bible study class once a week. (R. 200). The ALJ did not give any reasons why someone with disabling pain could not do any of these activities. Nor did he provide any reasons as to why these activities imply that Mr. Moore would be able to make it through a normal work day.

The ALJ also raised the issue of Mr. Moore's failure to seek the treatment that could be expected if the claimant had experienced the alleged pain. (R. 18). He specifically noted that although Mr. Moore claims to require a cane, none has been prescribed. (R. 18). An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain ... [a claimant's] failure to seek medical treatment." SSR 96-7p.

In *Ribaudo*, the court interpreted this rule to overturn an ALJ's credibility determination in part because he did not consider the explanation that the defendant gave for not taking prescription pain medication, namely that such treatment was ineffective. *Ribaudo v. Barnhart,* 458 F.3d 580, 585 (7th Cir. 2006). In his discussion of Mr. Moore's credibility, the ALJ failed to take into consideration several pieces of evidence that could have provided an explanation for Mr. Moore's

lack of regular treatment. At the hearing, when Dr. Mond asked him whether he had followed up on a referral to see a podiatrist after one of his emergency room visits, Mr. Moore answered, "No, because what they told me was that I didn't have any insurance and I couldn't afford to pay them." (R. 212). He also told the ALJ, "I don't have any insurance so I have to get my medicine whatever way I can sometimes." (R. 204). The ALJ never asked Mr. Moore if he knew of any programs or institutions which would have allowed him to seek free or subsidized specialist treatment for his impairments. The ALJ gave no reason why an uninsured man would seek a prescription for a cane that he could acquire without one, and for which in any event he would not be covered because he was uninsured.

Additionally, the ALJ did not discuss Mr. Moore's testimony that he made efforts to treat himself. Mr. Moore reported that when he has acute leg pain he soaks the leg in hot water and Epsom salts. (R. 205-06). Like in *Ribaudo*, where the claimant eschewed prescription medication due to ineffectiveness, Mr. Moore reported that he had tried 800 milligram ibuprofen but that they were not effective and that his doctors had recommended he not stay on them because of the risk of harmful side effects. (R. 207). Mr. Moore testified that the only thing that had ever relieved his pain was Vicodin, however, no doctor had ever prescribed this medication (he tried it when his sister had some for post-surgical pain). (R. 204). Mr. Moore also expressed reservations about the potential side-effects of Vicodin as a long term treatment option. (R. 207). Mr. Moore has had club foot and leg length disparity his whole life, perhaps he did not seek more treatment because he simply assumed that the doctors had done all they could for him and that he would just have to cope with the pain. Unfortunately we are left with only such speculation to explain Mr. Moore's behavior since to compound his failure to consider all the evidence, the ALJ never directly asked Mr. Moore why

29

he had not made more of an effort to seek treatment and thus failed in his obligation to fully develop the record. *See Grieves v. Astrue*, 2008 WL 2755069 at * 17.

Another justification the ALJ gives for finding Mr. Moore not credible is that Mr. Moore has asthma but continues to smoke. (R. 18). While this may be a reason to deny Mr. Moore's benefits if there were evidence that quitting smoking would restore his ability to perform substantial gainful activity, *see* SSR 82-59, it is unclear why it should bear on his credibility. When asked at the hearing, he readily admitted to the fact that he is a smoker. (R. 213). If anything, this forthrightness should bolster his credibility, not detract from it.

## B.

### The ALJ Improperly Discounted The Treating Physician's Opinion in Making his RFC Determination

When evaluating medical opinion evidence the ALJ must consider all of the following factors: examining relationship, treatment relationship, length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, and specialization. 20 C.F.R. 404.1527. An opinion on a potentially dispositive issue such as the RFC is not considered a medical opinion and the ALJ retains the final responsibility for deciding these issues. 20 C.F.R. 404.1527(e) Medical sources may provide evidence on the nature and severity of the claimant's impairments but no special significance is attached to their opinions with regard to the appropriate outcome for dispositive administrative findings. *Id.* In other words, doctors should make medical conclusions and the ALJ should make legal ones.

A treating physician's opinion is not necessarily entitled to controlling weight when there is well-supported contradicting evidence and the weight properly given to evidence provided by a treating physician depends on circumstances. *Hofslien v. Barnhart*, 439 F.3d. 375, 376-77 (7th Cir. 2006). Although treatment relationship does not automatically confer presumptive weight to an opinion "the checklist [provided by 20 C.F.R. 404.1527] is designed to help the administrative law judge decide how much weight to give the treating physician's evidence." *Id.* at 377. However, in making the RFC determination the ALJ must not ignore medical evidence favorable to the claimant. *Zurawski v. Halter*, 245 F.3d. 881, 888 (7th Cir. 2001). The ALJ must explain why such evidence is overcome by the evidence on which he relied. *Id.* at 889. The ALJ must also consider the claimant's disabilities in combination. *Gentle*, 430 F.3d. at 868.

The ALJ concluded that Mr. Moore was capable of performing the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a). (R. 17). He explains this finding with little more than the following statement: "The opinion of Dr. Mond, which is consistent with that of the State Agency physician, who essentially limited the claimant to a sedentary capacity...is consistent with the medical evidence of record and I adopt it." (R. 19). This is an abdication of the ALJ's responsibility to decide issues that are potentially dispositive. The ALJ does not indicate specifically how Dr. Mond's opinion is consistent with evidence. He does not focus on Dr. Mond's findings concerning the limitations resulting from Mr. Moore's impairments which might properly be considered medical evidence. Rather, he seems to adopt Dr. Mond's *conclusion* that Mr. Moore is capable of only sedentary work. Even if one interprets the word "essentially" in the ALJ's statement to indicate that the ALJ is evaluating the doctors' opinions concerning the underlying

31

evidence rather than their legal conclusions, there is a failure to provide specific reasons why this evidence overcomes other medical evidence which was more favorable to Mr. Moore such as the emergency room reports or the opinion of Dr. Elmes. Furthermore, the ALJ does not indicate if he took into consideration combination of conditions, and if he considered all of them or just those he found to be severe.

The ALJ's explanantion for his rejection of Dr. Elmes' opinion and his adoption of Dr. Mond's is the following:

> I do not agree with the sitting, standing, and walking criteria set forth in Exhibit 9-F by Dr. Elmes. They are not established in the narrative protion of his report except by the self reporting of the claimant. Nowhere can I find limitations on siting by any objective measurement. Pain in the legs of the nature described should be alleviated by sitting.

(R. 18). Of the factors he is required to consider in evaluating a medical opinion, he appears to have focused on supportability and consistency. He questions the supportability of Dr. Elmes' findings by pointing to the lack of objective tests. However, he gives no complementary analysis of the supportability of Dr. Mond's opinion and does not explain why his findings have a more objective basis. In fact he ignores the testimony of Dr. Mond who himself remarked on the paucity of medical evidence to serve as a basis for his opinion. The ALJ asked Dr. Mond if there was "sufficient objective evidence of record to allow you to perform an opinion." (R. 215). Dr. Mond replied, "Well, I'd have to interpolate and have to, have to use a fair amount of guess work here..." (R. 215). Dr. Mond didn't even have access to all the medical data available to the ALJ since Dr. Elmes' examination, the most recent x-ray in the record, and a spirometry report were performed after the hearing. (R. 162-71). As for the consistency factor, the ALJ seems to imply that Dr. Elmes opinion

is inconsistent with the evidence because pain in the legs should be alleviated by sitting. (R. 18). He does not indicate any medical basis for this assertion. *See Clifford*, 227 F.3d at 870 (noting that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record). He also states that Dr. Mond's opinion is consistent with the medical evidence of record. (R. 19). Beyond stating that it is consistent with the State Agency physician's opinion he does not explain how it is consistent with any other evidence.

Although he is not required to give it controlling weight, the ALJ does not even discuss the examining relationship factor. Dr. Elmes examined Mr. Moore, Dr. Mond did not. Another factor the ALJ does not discuss is specialization, Dr. Elmes is an orthopedist while Dr. Mond is not.

The ALJ did not adequately explain his evaluation of the medical evidence, abdicated his responsibility to make ad articulate legal conclusions, and ignored some evidence favorable to Mr. Moore. Therefore, the case must be remanded for a new RFC determination. Even if this were not the case, the RFC determination in this case would still need to be reconsidered in the light of my findings concerning the ALJ's step two, step three, and credibility determinations.

### Conclusion

This case is remanded to the Commissioner for further proceedings consistent with this opinion and limited to the question of plaintiff's disability during the period beginning June 1, 2002 and ending April 30, 2008. *See Thompson v. Astrue*, 583 F. Supp.2d 472, 475 (S.D.N.Y. 2008) (noting that the reviewing court may set limits on remand under 42 U.S.C. § 405(g)); *Sullivan v. Hudson*, 490 U.S. 877, 885 (1989).

ENTERED: _____

DATE: 9/2/10                    UNITED STATES MAGISTRATE JUDGE

33